| | |
|---|---|
| **DISTRICT COURT, ARAPAHOE COUNTY, STATE OF COLORADO**<br><br>Arapahoe County Justice Center<br>7325 S. Potomac Street<br>Centennial, CO 80112<br>(303) 645-6600 | DATE FILED: February 4, 2021 4:04 PM<br>FILING ID: D6262096A3F2A<br>CASE NUMBER: 2021CV30223 |
| **Plaintiff:**<br><br>ALADDIN PROPERTY HOLDINGS, LLC, a Colorado limited liability company,<br><br>v.<br><br>**Defendant:**<br><br>AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I., a Wisconsin corporation. | ▲ **COURT USE ONLY** ▲ |
| **Attorney for Plaintiff**<br><br>Name: Michael Y. Ley (#43733)<br>Address: BURNS, FIGA & WILL, P.C.<br>6400 South Fiddler's Green Circle<br>Suite 1000<br>Greenwood Village, CO 80111<br>Telephone: (303) 796-2626<br>Facsimile: (303) 796-2777<br>Email: mley@bfwlaw.com | Case No. |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff, Aladdin Property Holdings, LLC ("Aladdin"), by and through its attorneys, Burns, Figa & Will, P.C., states as follows for its Complaint and Jury Demand against American Family Mutual Insurance Company, S.I. ("AmFam"):

**Summary of Action**

1. This is a first party property insurance case stemming from AmFam's unreasonable delay and denial of Aladdin's claim. Aladdin owns residential property in Cherry Hills Village that sustained damage to its concrete tile roof. Aladdin submitted a claim on its Businessowners Policy issued by AmFam on April 25, 2019. Over the ensuing twenty-one (21) months, AmFam unreasonably delayed and denied the claim by, *inter alia*, relying on provisions not in the policy, changing its position, and not responding to voicemails, letters, and emails. Aladdin's insurance

agent admitted in a voicemail that the AmFam adjuster assigned to handle the claim "dropped the ball."

## Parties, Venue, and Jurisdiction

2. Plaintiff Aladdin is a Colorado limited liability company.

3. Defendant AmFam is a Wisconsin corporation that issues insurance policies in Colorado.

4. Venue is proper under C.R.C.P. 98(a) and (c), as the real property at issue in this lawsuit is located in Arapahoe County.

5. This Court has subject matter jurisdiction under COLO. CONST. art. VI, § 9.

6. This Court has personal jurisdiction over the parties under C.R.S. § 13-1-124(1)(a), (c), and (d).

## General Allegations

7. Aladdin owns property located at 2 Vista Road, Englewood, CO 80113-4910 (the "Property").

8. AmFam issued Businessowners Policy, policy number 05XQ682002, which included property insurance for the Property, with Aladdin as the named insured (the "Policy").

9. On April 25, 2019, Aladdin made a claim (no. 00-225-264977) on the Policy stemming from concrete roof tiles on the Property that were fracturing and breaking (the "Claim").

10. The broken roof tiles look like this:




2

11. The Property's roof is large, with a total roof area of approximately 13,600 square feet.

12. In May of 2019, AmFam hired Rivet Engineering Group, LLC ("Rivet") to investigate the cause of damage to the Property's concrete tile roofing.

13. Rivet issued a report dated May 31, 2019 (the "Rivet Report"). The Rivet Report concluded that the damage to the Property's concrete tile roofing was caused by repeated cycles of freezing and thawing.

14. Rivet also concluded that there was a "material defect in the cracked tiles."

15. Based on the Rivet Report, AmFam denied Aladdin's Claim. Specifically, in an email dated June 6, 2019, adjuster Bobbi Adams stated that "we are unable to extend coverage for non-storm related damages."

16. "Storm related damages" is a term that does not appear anywhere in the Policy.

17. Via letter dated April 27, 2020, Aladdin disputed the denial and argued that its Claim was covered under the terms of the Policy. Specifically, the Policy provides that "[w]e will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." The Property's concrete tile roofing is "Covered Property" under Section I, Paragraph (1)(a). Under Section I, Paragraph A(3), Covered Causes of Loss are "[r]isks of direct physical loss," except for certain losses excluded in Paragraph B or limited in Paragraph A(4). Here, Aladdin's Claim arose from a risk of direct physical loss to the Property's concrete rile roofing. The April 27th letter further explained why none of the Policy's exclusions or limitations apply to the Claim.

18. On May 11, 2020, Aladdin's counsel and a new adjuster assigned to the Claim, Steven Ewing, spoke to discuss the scope of damage to the Property's roof. Mr. Ewing stated that AmFam was interested in exploring whether AmFam could replace only the broken tiles, instead of a full roof replacement.

19. Thus, AmFam retracted the earlier denial and reopened the Claim.

20. Later that day, Aladdin's counsel emailed Mr. Ewing a document containing photographs and maps of the roof damage created by Aladdin's engineer.

21. Between May 11, 2020 and July 7, 2020, Aladdin heard nothing from AmFam, despite multiple calls, voicemails, and letters.

3

22. Specifically, between May 11, 2020 and June 17, 2020, AmFam did not respond to multiple voicemails left by Aladdin's counsel.

23. Aladdin's counsel wrote AmFam a letter dated June 17, 2020 (the "June 17th Letter"). In the June 17th Letter, Aladdin's counsel proposed a two-step process. First, Aladdin's counsel proposed that Aladdin and AmFam agree upon the areas of the roof that require repair. To accomplish this, Aladdin's counsel suggested that Aladdin's and AmFam's engineers meet at the Property. Second, Aladdin's counsel proposed that AmFam conduct petrographic testing of a damaged roof tile and a proposed replacement tile to determine if a spot repair was feasible. The June 17th Letter stated that this turned on whether the tile manufacturer "offers a suitable matching product." The June 17th Letter continued by stating that, if a suitable matching product was available, then petrographic testing would reveal whether the proposed replacement product suffered from the same design defects as the existing tiles. If the proposed replacement product reasonably matched the existing tiles and was not defective, then Aladdin was amenable to a spot repair rather than a full roof replacement.

24. AmFam ignored the June 17th Letter.

25. Between June 17, 2020 and July 7, 2020, Aladdin's counsel left Mr. Ewing multiple voicemails and wrote a letter dated June 26, 2020 asking for an update.

26. Aladdin was forced to involve its insurance agent, Jana Gravilla, to contact Mr. Ewing about the Claim.

27. On June 30, 2020, Ms. Gravilla emailed Mr. Ewing stating: "On policy 05-XQ6820-02, I am getting a voice mail from an attorney Mike Olay (?) asking for a status on this roof claim. His direct line is 720-493-3186. Can you please reach out to Mike and REPLY to me with the results of your conversation for our file."

28. Mr. Ewing responded to Ms. Gravilla two minutes later, stating "I will review and call him soon. I am in a meeting now."

29. No such call was made.

30. Ms. Gravilla followed-up with Mr. Ewing on July 7, 2020, stating: "This insured is stating that they have not been contacted in over a month on this claim. I cannot find where you provided the status after your call with Attorney Mike Ley per our emails on June 30. Can you please send me the correspondence as soon as possible and let me know the status at this point so I can assure [Aladdin] we are working on it?"

31. Ms. Gravilla left a voicemail for Aladdin's counsel on July 7, 2020 stating, *inter alia*, that Mr. Ewing "dropped the ball on this one" and "we need to get this going."

4

32. Mr. Ewing finally called Aladdin's counsel on July 7th, which was the first correspondence Aladdin received from an AmFam adjuster since May 11th.

33. On that call, Mr. Ewing agreed to proceed in the manner set forth in the June 17th Letter.

34. Aladdin's counsel sent Mr. Ewing a letter dated July 8th documenting the agreement.

35. AmFam did not respond to the July 8th letter or note its disagreement with the July 8th letter.

36. The July 8th letter further noted that Aladdin's counsel began the petrography process with David Rothstein, Ph.D., asked if Mr. Ewing was "able to make arrangements for Bartile to deliver a sample of its new product to Dr. Rothstein," and provided Dr. Rothstein's delivery address.

37. Between July 8, 2020 and August 21, 2020, Aladdin's counsel sent Mr. Ewing four emails requesting confirmation that AmFam delivered its proposed Bartile replacement tile to Dr. Rothstein for testing.

38. Aladdin did not hear from AmFam until August 21, 2020, when Mr. Ewing told Aladdin's counsel that AmFam had not taken any steps to deliver a sample of the proposed replacement tile to Dr. Rothstein.

39. Mr. Ewing asked that Aladdin's counsel facilitate that process and identified the proposed replacement tile as a Bartile product called 1696 Vintage Slate.

40. In a letter dated August 28, 2020, Aladdin's counsel confirmed that AmFam's proposed replacement product, as well as tiles taken from the Property's roof, had been successfully delivered to Dr. Rothstein.

41. AmFam agreed to pay, and upon information and belief did pay, Dr. Rothstein's fee for the petrographic testing.

42. On October 12th, Aladdin's counsel sent Dr. Rothstein's petrography report to Mr. Ewing.

43. Dr. Rothstein confirmed that the concrete tiles failed due to a process called frost wedging, which involves repeated freeze-thaw cycles. Microfractures in the tiles made them susceptible to frost wedging. Dr. Rothstein concluded that the Property's concrete roof tiles failed at different rates due to differences in sun exposure (such as North facing versus South facing) and roof angles (which makes some areas more prone to snow accumulation).

44. Dr. Rothstein also confirmed that AmFam's proposed replacement tile had a different composition than the existing tiles and, therefore, may not be subject to frost wedging. However, Dr. Rothstein observed that AmFam's proposed replacement tile was a different color and aesthetic than the existing tiles.

45. Below is a color photo of the two tiles taken from the Property's roof (left and middle) and AmFam's proposed replacement tile (right):



46. AmFam's proposed replacement product is not a reasonable match for the existing roof tiles.

47. After Aladdin's counsel's October 12th letter, Aladdin's counsel left Mr. Ewing voicemails on October 20th and 28th, and sent a letter dated October 28th.

48. Aladdin was again forced to involve their insurance agent—this time Tyson Liverant—to complain about the slow progress of the claim.

49. Mr. Liverant emailed Mr. Ewing on October 21, 2020, asking Mr. Ewing to respond.

50. Mr. Liverant emailed Mr. Ewing again on October 29, 2020 asking for a response and copying Mr. Ewing's manager.

51. Mr. Ewing's manager responded by asking Mr. Ewing to call Aladdin the next day (i.e., October 30, 2020).

52. Mr. Ewing finally called Aladdin's counsel on October 30, 2020. On that call, Mr. Ewing stated that he would be submitting the claim to subrogation and attempting to get the Claim approved for a full roof replacement.

53. After not hearing anything, Aladdin's counsel sent Mr. Ewing follow-up emails on November 6th, 11th, and 16th.

54. Aladdin did not hear from AmFam until November 20, 2020, when Mr. Ewing sent Aladdin's counsel the following email:

> The only thing we can do on the roof is to replace the section above the garage allowed and the unbroken tiles can be used on the other small areas. American Family does not owe to match concrete tiles, only close comparable match. I will pay the invoice for the testing as agreed. Let me know what the contractor can do to make the repairs to roof. Have a great weekend.

55. Aladdin's counsel responded with a letter dated December 28, 2020 that enclosed an engineering report from Vertex Engineering. The December 28th letter explained why AmFam's position was unreasonable in light of (i) the findings of AmFam's own engineer and (ii) the terms of the Policy.

56. First, AmFam unreasonably proposed that unbroken tiles from the roof be moved to replace the roof tiles that have broken. That proposal ignored that AmFam's own engineer, Rivet, determined that the existing roof tiles are defective. That conclusion was confirmed by Dr. Rothstein's testing. It is also the conclusion of Vertex Engineering, which opined that the existing roof tiles "should not be re-used at other areas of the residence, since these tiles were found to contain shrinkage cracks and will not perform as intended." In summary, Rivet, Dr. Rothstein, and Vertex Engineering concluded that all of the existing roof tiles have microfractures that make them susceptible to breakage after repeated cycles of freezing and thawing. Some tiles have simply yet to break apart due to more sun exposure, less water exposure, or both. Moving unbroken tiles to areas of the roof with less sun exposure or more water exposure will inevitably cause the tiles to break apart.

57. Second, AmFam unreasonably contended that the glossy red proposed replacement tile was a reasonably comparable match for the matte brown existing tiles. Any reasonable person looking at the color image in paragraph 45 above would disagree.

58. Mr. Ewing responded to the December 28th letter via email on December 30th and stated: "Good afternoon, Tuesday January 5th the managers and I have a committee meeting to

further review consideration of repair. I have read the engineer report provided. I will inform you of the decision made. Happy New Year and have a great weekend."

59. On January 11, 2021—approximately twenty-one (21) months after receiving the Claim—AmFam sent a reservation of rights letter dated January 6, 2021 stating, *inter alia*: "We are advising you at this time that there is a question whether coverage under the policy mentioned above will apply to this loss. The Company must conduct a complete investigation of the circumstances of the claim before determining whether your policy provides coverage for this claim. The Company will proceed with the investigation of this claim as is necessary or advisable."

60. The reservation of rights letter also referenced a Policy Endorsement stating that AmFam "will not pay to repair or replace undamaged material due to mismatch between undamaged material and new material used to repair or replace damaged material." AmFam is apparently relying on this Endorsement to claim that the Policy does not require AmFam to repair the Property's roof with concrete tiles that match the existing concrete tiles. In other words, AmFam appears to be taking the position, for the first time, that it can satisfy its obligations under the Policy by conducting a spot repair of the Property's roof using roof tiles that do not reasonably match the existing roof tiles. In addition to being an unreasonable interpretation of the Policy as a whole, AmFam's position is contrary to its earlier agreement to proceed in accordance with the June 17th Letter. It is also contrary to Mr. Ewing's November 20, 2020 email, where Mr. Ewing admitted that the Policy required AmFam to achieve a "close comparable match."

61. On January 18, 2021, Aladdin sent AmFam a final demand to pay the Claim and requested a response by January 25, 2021.

62. AmFam responded on January 29, 2021 via email from Mr. Ewing. The email stated: "Here is a copy of engineer report and denial letter." The email did not attach a denial letter. Instead, the email attached an updated report from Rivet and re-attached the reservation of rights letter dated January 6, 2021.

63. Aladdin responded within ten (10) minutes asking if Mr. Ewing attached the correct document. As of the date of filing this Complaint (February 4, 2021), Mr. Ewing did not respond.

64. The updated Rivet Report, dated January 15, 2021, agreed with the findings in the Vertex Engineering Report. Rivet expressly opined that the course of action in Mr. Ewing's November 20, 2020 email was not advisable. Specifically, Rivet stated: "Rivet and Vertex agree that the 'uncracked' tiles at the subject roof should not be considered for reuse at other regions of the roof."

65. In summary, AmFam initially denied the Claim because the Claim did not involve "storm related damages." That was an unreasonable denial of the Claim. AmFam then retracted its earlier denial, but proceeded to unreasonably delay the Claim. The background above details at least three-to-four months of the Claim process that are solely attributable to AmFam not

8

responding to calls or emails—to say nothing of the months of delay caused by AmFam's initial unreasonable denial. AmFam's delay has been the difference between replacing the roof in the warm summer or fall months versus Aladdin's current situation of trying to replace the roof in the snowy winter months. Then, AmFam again unreasonably denied the Claim by only offering a very limited repair that is contrary to the findings of AmFam's own engineer and inconsistent with the terms of the Policy. That was followed by a reservation of rights letter—twenty-one (21) months into the Claim process—with statements inconsistent with the parties' agreement to follow the procedure in the June 17th Letter and contrary to Mr. Ewing's November 20, 2020 email. It also stated AmFam's intent to "proceed with the investigation of this claim." Finally, AmFam re-sent the exact same reservation of rights letter with an updated report from its own engineer opining that AmFam's proposed replacement plan was not advisable.

66. As best summarized by Aladdin's insurance agent, AmFam "dropped the ball."

67. AmFam had a duty to promptly investigate the Claim and timely pay all benefits owed to Aladdin. AmFam breached those duties, acted in bad faith, and unreasonably delayed and denied Aladdin's Claim. The facts above demonstrate that AmFam also failed to reasonably investigate Aladdin's claim in good faith in a timely manner; failed to reasonably evaluate Aladdin's claim in good faith in a timely manner; failed to reasonably respond to the inquiries of Aladdin in good faith; failed to reasonably consider all relevant evidence; failed to reasonably consider Aladdin's damages in such a manner as to construe ambiguities in favor of coverage and find coverage where available; failed to reasonably, timely and in good faith, compensate Aladdin as required by contract and law; failed to reasonably provide benefits for which Aladdin paid in a timely manner; and refused to reasonably communicate.

**First Claim for Relief**
**Breach of Contract**

68. Aladdin incorporates by reference all allegations contained in this Complaint.

69. Aladdin entered into an enforceable contract with AmFam for the purpose of AmFam providing insurance for the Property.

70. The Policy applies to the Claim and was in place at time of the Property damage addressed in this Complaint.

71. AmFam had a duty to perform in a manner set forth in the Policy and the parties' subsequent agreements, as set forth above.

72. AmFam breached its duty to perform under the Policy.

73. Aladdin has timely paid all premiums required by the Policy.

9

74. Aladdin has substantially performed and fulfilled all obligations under the Policy.

75. Aladdin has cooperated with AmFam during the pendency of the Claim.

76. Aladdin is a first party insured and intended beneficiary of the Policy.

77. As a direct and proximate result of AmFam's breach of contract, Aladdin has suffered damages in an amount to be proved at trial, in addition to Aladdin's reasonable attorney fees, costs, and prejudgment interest.

**Second Claim for Relief**
**First Party Statutory Claim Under C.R.S. § 10-3-1116**

78. Aladdin incorporates by reference all allegations contained in this Complaint.

79. AmFam delayed and denied payment of insurance benefits to Aladdin without a reasonable basis for its action.

80. Under C.R.S. § 10-3-1116, Aladdin is entitled to recover from AmFam two times the covered benefits, plus reasonable attorney fees and costs.

**Third Claim for Relief**
**Bad Faith**

81. Aladdin incorporates by reference all allegations contained in this Complaint.

82. AmFam owed Aladdin a duty to act in good faith in investigating, reviewing, adjusting, and settling the Claim.

83. AmFam breached its duties to AmFam, and acted in bad faith, through its conduct described above, including, but not limited to, the following:

    a) Repeatedly failing to respond to voicemails, emails, and letters for weeks or even months at a time;

    b) Initially denying the Claim for a reason that had no basis in the Policy;

    c) Only offering a very limited repair that is contrary to the findings of AmFam's own engineer and inconsistent with the terms of the Policy;

    d) Backtracking on the parties' agreement to follow the procedure in the June 17th Letter;

  e)  Taking a position contrary to Mr. Ewing's earlier admission that AmFam must find a replacement roof tile that is "a close comparable match"; and

  f)  After nearly two years, issuing a reservation of rights letter stating AmFam's intention to "proceed with the investigation of this claim."

84.  AmFam's actions were unreasonable.

85.  AmFam knew its conduct was unreasonable or recklessly disregarded the fact that its conduct was unreasonable.

86.  As a direct and proximate result of AmFam's breaches of its duties to Aladdin, Aladdin has suffered damages in an amount to be proved at trial, in addition to Aladdin's reasonable attorney fees, costs, and prejudgment interest.

WHEREFORE, Aladdin respectfully requests that this Court enter judgment in its favor and against AmFam for:

(1) All general damages, economic damages, and special damages allowed by law;

(2) Statutory amounts under C.R.S. § 10-3-1116;

(3) Reasonable attorney fees and costs;

(4) Prejudgment and post-judgment interest; and

(5) Such further relief the Court deems proper.

ALADDIN DEMANDS A JURY ON ALL ISSUES SO TRIABLE

Respectfully submitted this 4th day of February, 2021.

BURNS, FIGA & WILL, P.C.

*\*\*Original signature on file at*
*BURNS, FIGA & WILL, P.C.\*\**

By: *S/ Michael Y. Ley*
   Michael Y. Ley (#43733)

**Attorney for Plaintiff**